Jared Allebest, #13485
Attorney for Plaintiffs
8978 South Quarry Stone Way
Sandy, UT 84094
Cell: (949) 322-3991
Videophone: (801) 204-9055
Email: Jared@Allebest.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KRISTINE PATERSON, an individual, EDWARD SPREEEN, an individual, McCall SCADLOCK, an individual, UTAH ASSOCIATION of the Deaf, an organization and Roes I-X<br><br>Plaintiffs,<br><br>vs.<br><br>SK5 WOLVERINE CROSSING, LLC, an organization, ANDREA AUSTIN, an individual, JORDAN HANKS, an individual and ROES I-X.<br><br>Defendants. | COMPLAINT<br><br>Civil No. 2:16-cv-01264-TS<br><br>Judge: Ted Stewart<br><br>Jury Trial Requested |

Kristine Paterson, Edward Spreen and McCall Scadlock (hereinafter "Ms. Paterson", "Mr. Spreen" and "Ms. Scadlock"), by and through their attorney JARED M. ALLEBEST of the Allebest Law Group, hereby submits the following:

### PRELIMINARY STATEMENT

1.      Kristine Paterson, Edward Spreen and McCall Scadlock, the Plaintiffs, are individuals who are Deaf and who is bilingual in English and American Sign Language. They do not wear hearing aids or cochlear implants of any kind. On one or more occasions, the Defendants failed, or refused, to provide the requested accommodations for one or more of the Plaintiffs.

1

2.      Defendants, jointly and severally (including various agencies and divisions), lease and operate places of "Public accommodation" for purposes of 42 U.S.C. § 12132 and the implementing regulations, 28 C.F.R. § 36.104.

3.      The Defendants (including their various agencies and divisions) are obligated by Title III of the ADA to ensure that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation." §28 CFR 36.201

4.      The Defendants failed to establish within their agencies and divisions, policies, practices, and procedures required under the ADA to ensure that persons who are Deaf are not subjected to discrimination. If such policies do exist, the Defendants (including all various agencies and divisions) failed to assure that agents, and/or its other agents, are aware of the polices and/or are properly trained to follow and practice the procedures such policies would mandate. Furthermore, the Defendants' illegal methods of administration over their respective programs and/or personnel tend to exclude and segregate people with disabilities from the benefits of public programs or services.

5.      The ADA is a legislative response to the fact that "historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

**JURISDICTION AND VENUE**

6.      This action arises under the law of the United States, including Title III of

the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") The Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. 1343(a)(3), as well as 42 U.S.C. § 12188(a) and 42 U.S.C. §12133, and 42 U.S.C. § 1983 for claims arising under color of law.

7.      Venue of this action is appropriate in the United States District Court for the District of Utah, Central Division, pursuant to 28 U.S.C. § 1391(b) and (c) as the claim arose in such district and, further, as the Defendants conduct business in such district.

## THE PARTIES

8.      Kristine Paterson, Edward Spreen and McCall Scadlock, the Plaintiffs, are individuals who are Deaf and who is bilingual in English and American Sign Language. They do not wear hearing aids or cochlear implants of any kind.

9. The Utah Association of the Deaf (UAD), an organizational Plaintiff, is a non-profit organization dedicated to the educational, social and economic welfare of the Deaf in the state of Utah.  Its members are placed at risk by the discriminatory policies, practices and procedures of the Defendants.

10.     The Plaintiff, The Utah Association of the Deaf (UAD), is a Utah non-profit corporation organized for the purpose of helping to eliminate discrimination against individuals who are Deaf by ensuring compliance with laws intended to provide access, effective communication, public accommodations and public benefits and services. The ADA constitutes such a law. UAD is qualified as a charitable organization under 26 U.S.C. § 501(c)(3). Members of UAD are primarily individuals who are Deaf and persons related to individuals who are Deaf. UAD has over 1000 members, most of whom are residents of Utah. Many UAD members require interpreters for effective communication when

accessing government programs and services as well as public accommodations which contract with public entities to provide services. UAD members have been or will be subjected to discrimination, lack of access, and limitations to services when compared with the non-disabled persons when attempting to access programs and services the Defendants sponsor and operate.

11.     UAD has standing as the representative of its members and in its own right. UAD's organizational purpose is adversely affected by Defendants' engaging in discrimination including: (1) Failing to provide effective communication to persons who are Deaf using auxiliary aids and services; (2) by employing administrative methods which result in exclusion, denial of services, and segregation of people with disabilities; (3) by failing to adjust policies and procedures which have the effect of discrimination against people with disabilities, such as Defendants' failure to bring a certified interpreter when they know or should know they will be dealing with a person who is Deaf and failure to call an interpreter when needed to establish effective communication.

12.     UAD and its members suffer direct and identifiable injury as a result of Defendants' actions, as UAD and its members and potential members are injured when municipalities and commercial businesses refuse to comply with the ADA, but instead continue to discriminate against persons with disabilities. As a result of their disabilities, certain features of accessibility are necessary to allow UAD's members access to public benefits and services, which access is required under the ADA. Accordingly, UAD's disabled members cannot fully and evenly participate in the amenities of living in Utah unless Defendants comply with the requirements of Title III of the ADA.

13.     Wolverine Crossing is a Multi-unit apartment complex serving many

residents and is the type of housing unit subject to the Federal and Utah Fair Housing Acts and the Americans with Disabilities Act. They are a private entity that leases and operates places of public accommodation as defined by the ADA such as schools, offices and convention centers for party business and activities. §28 CFR 36.104

**FACTS**

**McCALL SCADLOCK**

14. Ms. Scadlock signed her Student Housing Rental Agreement on April on April 26th 2014. (See Attachment #1).

18. Ms. Scadlock filled out her initial complaint to UALD on July 2nd 2014. (See Attachment #2).

15. Verolinda Granados, the Intake Officer at the UALD, sent a letter directly to Mr. Scadlock on July 21st, 2014 informing her that her Housing Discrimination Complaint Form was sent for her review and if the complaint was satisfactory, Ms. Scadlock must return it with her signature in view of a notary public. ( See Attachment #3)

16. A partial notice exists of someone from UALD informing Ms. Scadlock on March 25, 2015 that the processing of her complaint cannot be completed in one year from the date the complaint was received and notified her of the reasons for the delay in the completion of the processing and investigation of the complaint. (See Attachment #4)

17. Ms. Scadlock's attorney, Dale Boam, provided her "Responding Position Statement of McCall M. Scadlock" in which he outlines why Wolverine Crossing engaged in discriminatory practices against his client. (See Attachment #5).

18. Kerry L. Chlarson informed Ms. Scadlock on October 26, 2015 that as a result of their finding of "No Cause" against the Respondents in that case, her case is dismissed.

5

(See Attachment #6.) Attached in that letter was the Final Investigative Report, Determination and Order which was issued that same day. (See Attachment #7).

19. Mr. Boam filed a Notice of Intent and Request to Appeal from Division's Determination and Order Order on November 13th 2015. See Attachment #8).

20. Kerry L. Chlarson sent a letter to Mr. Boam on November 20th, 2015 notifying him that they had received Ms. Scadlock's request for reconsideration of the Director's determination. (See Attachment #9).

21. Mr. Chlarson sent Ms. Scadlock's attorney his Reconsideration Order on December 2nd, 2015. (See Attachment #10).

22. Mr. Chlarson sent a letter to Ms. Scadlock's attorney on December 3rd 2015 informing Mr. Boam that the "Division is denying the request for reconsideration of the Director's determination and order" that was dated on December 2nd 2015. See Attachment #11).

## **EDWARD SPREEN**

23. The Law Offices of Kirk A. Cullimore sent a letter with the UALD on September 16th 2014 notifying the office that they are representing Sk5 Wolverine Crossing, LLC, Andrea Austin and Jordan Hanks. They denied any and all claims of discrimination against the Complainant. That letter was received by the UALD on September 17th, 2014. (See attachment #12).

24. Stephanie Carrillo notified Mr. Spreen that a copy of the Respondent's written complaint was provided to him and that Mr. Spreen was to provide his own written response by October 6, 2014. (See Attachment #13).

25. Stephanie Carrillo sent a Second and Final Request letter to Mr. Spreen on

October 9th, 2014 informing him that a copy of the Respondent's rebuttal was sent to him for his response but that the UALD had not yet received a response. They requested that he review the Respondent's statement and submit his rebuttal before October 17th, 2014. (See Attachment #14).

26. Stephanie Carrillo, an Antidiscrimination Agent at the UALD, sent Mr. Spreen a letter on November 4th, 2014 that the processing of her complaint cannot be completed in one year from the date the complaint was received and notified her of the reasons for the delay in the completion of the processing and investigation of the complaint. (See Attachment #15).

27. Verolinda Granados, the Intake Officer at the UALD, sent a letter directly to Mr. Spreen on July 18th, 2014 informing him that his Housing Discrimination Complaint Form was sent for his review and if the complaint was satisfactory, Mr. Spreen must return it with his signature in view of a notary public. (See Attachment #16).

28. On July 21st, 2014, the UALD office stamped "received" on Mr. Spreen's Housing Discrimination Form. (See Attachment #17).

29. Stephanie Carrillo, sent Mr. Spreen a second letter on July 22, 2015 that the processing of her complaint cannot be completed in one year from the date the complaint was received and notified her of the reasons for the delay in the completion of the processing and investigation of the complaint. Attachment #18).

30. Verolinda Granados, the Intake Officer at the UALD, sent a letter directly to Mr. Spreen on July 23, 2014 informing him that his Amended Housing Discrimination Complaint Form was sent for his review. (See Attachment #19). On the same day, Mr. Spreen also received a letter directly from Kerry L. Chlarson informing him that they had

received his complaint and that the "Resolutions Conference has been scheduled for August 5th, 2014 at 9:30 AM at the Heber M. Wells Building." (See Attachment #20).

31. Kerry L. Chlarson informed Mr. Spreen on October 26, 2015 that as a result of their finding of "No Cause" against the Respondents in that case, his case is dismissed. (See Attachment #21) Attached in that letter was the Final Investigative Report, Determination and Order which was issued that same day. (See Attachment #22).

32. Mr. Boam filed a Notice of Intent and Request to Appeal from Division's Determination and Order Order on November 13th 2015. See Attachment #23).

33. Mr. Charlarson sent Mr. Spreen's attorney a letter notifiying him that they have received his request for reconsideration. (See Attachment #24).

34. Kerry L. Charlarson, Director of the UALD, sent Dale Boam his Order Denying Reconsideration in Mr. Spreen's case On December 2nd 2015. Attached to that letter was the Order Denying Reconsideration. See Attachment #25).

35.Mr. Chlarson sent a letter to Mr. Spreen's  attorney on December 3rd 2015 informing Mr. Boam that the "Division is denying the request for reconsideration of the Director's determination and order" that was dated on December 2nd 2015. See Attachment #26).

## KRISTEN PATERSON

36. Anita Kiteau signed a letter/contract with Kristen Paterson stating that "management authorized Kristen Paterson of F421-6 to have her companion animal with her earlier as of Tuesday, August 21st, 2012" and that she will turn in her "animal request form no later than Thursday, August 23rd, 2012 before the office closes at 8:00pm." Kristine Paterson agreed that she will be responsible for any damage caused by the

companion animal and that she must remove the companion animal if she doesn't turn the form into the office. (See Attachment #27)

37. Ms. Kiteau sent an email on March 15th 2013, to all the tenants who for the Community Ambassador position. She wrote, "Dear Applicants, I have heard from most of you about the group process activity next week. Here is the schedule for when you are supposed to attend.

Tuesday, March 19 at 6-9pmpm

1) Syanne Williams

2) Echo Wallen

3) Hannah Nielsen

4) Brianne Hiatt

5) Savannah Netherton

6) Houston Wright

7) Matthew Robbins

8) Kristina Sellers

9) Danielle Ellis

10) Charzelle McAngus

Thursday, March 21st at 6-9pm

1) Christy Gruber

2) Matthew Moody

3) Johnny Call

4) Diane Davis

5) Linsey Graig

6) Kristen Paterson

7) Jade Lundberg

8) Janay Langford @ 8pm

9) Savanna McDonald

10) Tyler Wilson

If your name is not listed on here, I have either spoke to you or not. You will hear from us whether you get an official interview or not after the group process. Please make sure to be on time unless if you have spoken to me for a specific time. Meet at 6pm in the Community Room, which is on the East side of the G building and the room is right across from the East pool (the G building is the first building to the right as you enter Wolverine Crossing from the South East entrance under the big arch). There will also be signs for direction. Feel free to call the office if you have any question. We look forward to seeing everyone next week. This is an informal group process and while its not required to dress up in business casual, please still dress appropriate but comfortable for you will be moving around for some of the activities." (See Attachment #28).

38. Ms. Paterson got an email about the group interview. She went to the office to ask Anita if they had an interpreter for the group interview and Anita said "yes". Later, Kristine was informed that Mary McLerran was not available to interpret but that McCall Scadlock offered to interpret the meeting. Ms. Paterson rejected the proposal to have Ms. Scadlock interpret the meeting because Ms. Scadlock is Hard of Hearing and is not a certified and qualified American Sign Language Interpreter. It was later discovered that Wolverine Crossing had contacted Ms Scadlock to see if she could interpret at that meeting but that Ms. Scadlock declined that request because she knew she was not

certified or qualified to be an ASL interpreter. (See Attachment #29).

39. Ms. Paterson asked Valerie Iglesias if she could interpret at the meeting. She declined Ms. Paterson's request because she is not certified or qualified to be an ASL interpreter. Ms. Paterson informed Ms. Iglesias that Wolverine Crossing had asked Ms. Scadlock if she could interpret at the meeting. Ms. Iglesias was surprised by that news and accompanied Ms. Scadlock and Ms. Paterson to the Wolverine Crossing Office. (See Attachment #29).

40. The three women met with Anita to discuss the fact that Wolverine Crossing was obligated to provide a certified and qualified ASL interpreter under the ADA and what the consequences would be if a certified and qualified ASL interpreter was not provided. Wolverine Crossing was provided the contact information to Interwest, an agency that provides certified and qualified ASL interpreters. However, Anita wasn't sure if she could provide an certified and qualified ASL interpreter because the group meeting was to occur in two hours. Yet, Anita assured the three women that she would email Ms. Paterson when she got with her boss to figure it out. When Kristine Paterson checked her email, she was surprised to find that she was not offered the position of Community Ambassador. Ms. Paterson never got the chance to have the group interview. (See Attachment #29).

41. Carol MacNicholl posted a note she received a note from Ms. Kiteau on the UVU ASL Club Facebook Group page on March 28th 2013.  A screen shot of that message has been captured.



The full message reads, "Hi Carol, How are you? I'm reaching out for your help if you know a student here around UVU who is hearing but can sign and interpret. I'm hiring my student leaders right now for our housing and I need someone who can both hear and sign to help us communicate with our ASL residents. If you have any friends to recommend please let me know and I can reach out to them. I'm hiring right now and I like to hire someone soon for the whole next year (May 15, 2013 to May 10, 2014). Thanks, Anita 916-896-8092 anita.kiteau@wolverinecrossing.com." This comment was subsequently taken down and deleted. (See Attachment #30).

42.  Anita Kiteau sent an email to Ms. Paterson on March 29th 2013, informing her

that her application to the Community Ambassador was denied. Mrs. Kiteau wrote, "Dear Kristen Paterson, Thank you for expressing interest in working at Wolverine Crossing by applying for the Community Ambassador position. We regret to inform you that after reviewing all of the applications, we concluded that other candidates were better suited for the position. We certainly encourage you to apply for other positions we may post in the future. Again, thank you for your interest and we wish you all the best in your future endeavors." (See Attachment #31).

43. On the same day (March 29th, 2013) Anita sent an email to Matt Moody, another Deaf tenant at Wolverine Crossing, to explain why he was not hired at that position. Anita wrote, "Dear Matt Moody, Thank you for expressing interest in working at Wolverine Crossing by applying for the Community Ambassador position. We regret to inform you that after reviewing all of the applications, we concluded that other candidates were better suited for the position. We certainly encourage you to apply for other positions we may post in the future. Again, thank you for your interest and we wish you all the best in your future endeavors." (See Attachment #32).

44. Matt Moody, sent a separate email to Ms. Kiteau asking, "May I ask why I am not suited for this position?" Anita replied that, "Sure, 1) Your application was OK, didn't have a lot of good experiences and you wrote your answers right before turning it in instead of typing 2) You did fine in the group processing but came late 3) A lot of duties as a CA have to do with communication and we feel as a committee this may be more challenging for you compared to other applicants, not only with answering the phone but helping with mediation While you maybe qualified at some, there were several qualified applicants who best fit for the job right now. Thanks, Anita." (See Attachment #33).

13

45. Matt Moody subsequently learned that he was not qualified because he is Deaf and he must use a phone to communicate with all the tenants even with those who live on the 4th floor which is almost full of deaf tenants who communicate in American Sign Language. (See Attachment #34).

46. The following day on March 30th, Mary McLerran, a tenant at Wolverine Crossing, sent an email to Matthew Chambers, who was employed at the Housing Office at Utah Valley University and Dan Hoffman who is employed as a Professor at Utah Valley University. Mrs. McLerran wrote, "Matt and Dan, I believe there is currently a very big cultural divide between the two worlds of the hearing people in the office at Wolverine Crossing and the Deaf world of ASL Academic Village. The majority of hearing people erroneously believe that to be a successful worker, the person must be able to hear sounds. This is not true. There are devices that can assist a Deaf person who needs to answer phones such as captioned phones or relay services. Rush Limbaugh, a radio talk show commentator, responds to callers everyday even after he became deaf using various technology. Wolverine Crossing has phones that need answering, questions from potential future residents who come in off the street, etc. They cannot perceive how this sort of work could be accomplished by someone who cannot hear. It may be helpful for Wolverine Crossing to be educated as to how a Deaf person could successfully navigate these encounters. It would be good for the future of ASL Academic Village if we can maintain a good working relationship with Wolverine Crossing. And if Wolverine Crossing could see how a Deaf person could be a perfect fit for their work environment, it would be good for the future of the Deaf community and Wolverine Crossing. This could end up as a "win win" situation. I truly hope it will. Thank you for your help and support in this sticky

situation." (See Attachment #35).

47. On the first day of April 2013, Mrs. McLerran sent another email to Mr. Chambers. She wrote, "Matt, I will be available today around 10 am. I need to travel to SLC this morning, but should be back by 9:45.. Do you want me and/or Dan Hoffman to come with you to visit with Wolverine Crossing management? I am on Spring Break this week from Alpine School District. If you think it is better for you to go by yourself, Dan and I would like to meet with you afterwards to get a report. I will check with Dan to see when he is available. Thank you for your willingness to help with this situation.  On another subject, for our party April 13, is it ok for us to cook the food ourselves to serve that evening, or is there some law we have to follow that says we must have it catered? And could you please bring me another card for who we submit the pre-budget to get it approved? It was on my fridge but has disappeared." (See Attachment #36).

48. The following day, another tenant at Wolverine Crossing sent an email to Matthew Chambers. The email reads, "My name is Valerie Iglesias and this is what happened. The first time I knew of Kristen applying for the Community Ambassador Position at Wolverine Crossing was when she came to my apartment asking if I could interpret for her group interview for the position. She told me that the group interview was to qualify for a one on one interview for the position. I explained to her that if I was to interpret for her that it would be illegal, because I was not a certified interpreter. I further explained to her why it was illegal, that due to A.D.A only certified interpreters could interpret for job interviews and that the company that was doing the hiring process was required to provide an interpreter in order to be "free, open, accessibility" for persons who have a disability under the law. She understood and seemed relieved that the law required

15

them to provide an interpreter for her. I was relaxed, because I knew that Wolverine Crossing was affiliated with ASL Academic Village and UVU. I assumed that because of this affiliation, that there would be no problem finding an interpreter. I heard later from Kristen that she never got the group interview, but didn't hear why or anything really further. Some time later, Kristen came to my apartment distressed. I asked her why and she said that the office had tried to get Mary, person without certification, to interpret and when they couldn't they tried to get McCall, hard-of-hearing un-certified person, to interpret for Kristen. She asked me to come down to the office in order to explain the same thing I explained to Kristen about the requirement for a certified interpreter. I went down there and explained to the best of my ability about A.D.A. I had the entire conversation with Kristen and McCall present. I talked to Anita the entire time. I mentioned several times throughout the conversation that I wasn't an expert on A.D.A, because the law itself was huge and very complicated. I explained that a certified interpreter was required due to it being a job interview and that private businesses are required to have "free, open, accessibility" for persons included in the law, including deaf people. I tole her that if Kristen would be hired and if their business had 15 or fewer employees then they weren't legally required to have an interpreter for her. I gave Anita three references that she could use and Kristen gave her another reference that could be used. I reference Dale Boam, an attorney that specialized in the A.D.A law, Johnny Rider, a certified interpreter, and Michael Farner, another certified interpreter, that could be used. Kristen reference the company, "Interwest" so they could hire an interpreter easily. Anita told me that she could not make the decision herself and that she needed to contact her lawyer and the owner of Wolverine Crossing to discuss it with them. She also said, "Ok, so we'll

set up a one on one interview with Kristen then." She promised to set up an interview with Kristen and to hire an interpreter. I heard the day after from Kristen that she had been turned down for the position without an interview. That is what happened to the best of my knowledge. I hope that this situation can be resolved as soon as possible." (See Attachment #37).

49. The Deaf tenants who applied for the position for Community Ambassador were disappointed and upset that they were denied this employment/volunteer opportunity because they wanted to help heal the relationship between Wolverine Crossing and ASL Village. They wanted to be a liason between the Deaf community and the Hearing Community at Wolverine Crossing. Wolverine Crossing denied these applicants because by reason of their disability of being Deaf.

50. Ms. Kiteau sent an email to Bart Gibb on August 17, 2013 asking him to make sure that the cleaners do a deep clean of the common area in room F421 due to the fact that there was a dog in that residence because of the smell coming from that room and that new residents were moving in that day. (See attachment #38).

51. Stephany Downing sent an email to Jordan Hanks on September 20 2013 asking Mr. Hanks to send a letter to Ms. Paterson informing her that she has a damage charge for cleaning the carpets because her pets poop all over the carpeting. She is being charged $120 for power scrub and odor removal. (see Attachment #39).

52. Terry sent a email to Jordan Hanks on November 18th 2013 regarding the fact that Ms. Paterson was complaining about the people who inspected her apartment and that Terry was not sure what to do. The following day, Stephany sent a reply to Terry's email using Andrea Austin's email account informing him that Andrea will be out of the

office and that if Ms. Paterson comes to talk to him to complain about the apartment inspectors, that Terry should sent Ms. Paterson to her. (See attachment #40).

53. Jordan Hanks sent an email to the entire staff of Wolverine Crossing to discuss the future of ASL Village and to air his frustration that regarding open mic night and ASL village. (See Attachment #41)

54. Andrea Austin, the General Manager of Wolverine Crossing, sent a letter on December 19th 2013 informing Ms. Paterson that she is being moved to a new apartment and placed on deferred eviction because of disturbances in the old apartment. Specifically, Ms. Paterson was informed that she was in violation of "not living in a cooperative manner with roommates" and was disrupting the common work of cleaning check supervisors." (see Attachment #42).

55. Ms. Paterson signed Student Housing Residential Agreement with Wolverine Crossing on January 3rd, 2014. (See attachment #43).

56. Andrea Austin sent an email to Ms. Paterson on February 5th 2014. That email reads, "Hi Kisten! I look forward to meeting you tomorrow. I wanted to let you know that we have spoken with our attorney's office regarding ADA and Fair Housing Laws, and we are not required to provide an interpreter. If you would like to bring someone with you, you are more than welcome to! ;) If you decide not to, I will be more than happy to accommodate your needs, whether that be writing or whatever helps you feel most comfortable. Let me know if you have any questions and I look forward to seeing you tomorrow! Thanks. Andrea." (See Attachment #44).

57. Facebook sent a notice to Andrea Austin on February 20th 2014 that Ms. Paterson left a Facebook message on a photo that Wolverine Crossing placed on their

Facebook page. Ms. Paterson's message reads,"It won't be fun since u refuse to provide interpreter and we feel left out and not feel belong to u guys. So in other word, it's boring!" (See Attachment #45).

58. Will Cross, sent a response to Ms. Paterson's Facebook message on 2/20/14 at 11:49 AM informing her that they have given her many opportunities to meet with them to discuss this matter but that Ms. Paterson never replied to their emails. Kristine replied at 2:10 PM requesting that "your lawyer talk to my lawyer. My lawyer can show your lawyer new law. Ever since it happen, I felt uncomfortable, left out, hurt and Jordan threaten my dog and its hurt. I feel like I don't know anyone here and communicate is hard. I feel like new owner is against us. We feel left out." At 3:12, Willa replied, "Yes, I believe I gave you all of our attorney's contact info earlier this week. If you need that again, let me know." Willa then left another message at 3:15 PM stating that, "I apologize that you felt uncomfortable or left out. That is certainly not our intention. Jordan didn't threaten your dog, all companion animals have to be kept on a leash. That's part of the rules you signed when you were approved for a companion animal. No one is out to get you, but when arguments occur with your CA instead of bringing your concerns to me, it makes it more difficult to fix the situation. Terry doesn't set our policies and he is the RA for an entire building, not just Academic Village. When he's at an activity for the whole property, he has lots of residents he must attend to. Same thing with Ben and Jordan. You guys are more than welcome to schedule an appointment with me to discuss any and all concerns." At 3:26, Kristine replied that, "we didn't argue with Terry. I don't know where u get it form. We didn't argue. Excuse me but we are part of resident and we paid rent, etc just like they do and we don't get to enjoy our activities like they do. Its unfair

and it's not right. About Jordan. A day after we had requested interpreter, I got letter from Jordan. It's called revenge and its illegal. And we did report to cop about my friend laptop in the community room and cop had conversation with one of staff and said camera didn't work. So many fishy going on." At 4:36, Willa Cross replied, "The letter from Jordan had nothing to do with your request. We fine every resident who does not keep their animal on a leash. If you'd like to discuss this further, please schedule a time to come in and meet with you." (see attachment # 46).

59. Dale Boam, the attorney for Ms. Paterson, sent a letter to the Financial Director at Utah Valley University on August 7th, 2014 informing them that he is representing her in a housing dispute and that the stress of the litigation is taking its toll on his client. He requests that some leeway be given to her because of this stressful situation. (See Aattachment #47)

60. Kirsten Paterson's psychologist, Dr. Eileen Booth also sent a letter to the Financial Aid office at UVU informing them that she has been struggling with emotional issues that stem from the "legal and social issues created at her housing unit" and that she "took the initiative to move to a new apartment" where "the management there is working with her needs." (Attachment #48).

61. Ms. Paterson filed a complaint of discrimination on May 13th 2015. (See Attachment #49). Mr. Boam, the attorney for Ms. Paterson faxed that UALD complaint on the same day. (See Attachment #50).

62. The Defendant, Wolverine Crossing, presented a Three Day Notice to Vacate on May 13th, 2014. (See attachment #51). They also sent her a letter to Ms. Paterson informing her that the reason why she was being evicted out of her apartment was that

she violated her lease agreement by being "unable to live in a cooperative manner with roommates" and violating the "roommate agreement meeting." (See Attachment #52). Mr. Paterson's attorney also sent a letter to Wolverine Crossing stating that the Three Day Notice to Vacate were deficiently served and was done in retaliation to Ms. Paterson filing a complaint with the UALD. (See Attachment #53)

63. The following day, Ashley Gill, another Deaf tenant at Wolverine Crossing sent a letter to the Apartment stating that she was withdrawing her letter of complaint regarding Kristine Paterson because she had nothing to complain about her roommate Kristen Paterson and that they misunderstood her complaint. (See Attachment #54)

64. Kyrie Butler, an Intake Officer with the UALD, sent a letter to Ms. Paterson on May 21, 2014 that asked her to review her Housing Discrimination complaint. (See Attachment #55).

65. Kyrie Butler sent another letter directly to Ms. Paterson on June 4th, 2014 and asked her to review her Housing Discrimination Complaint and return it with her signed in the presence of a notary public. (See Attachment #56)

66. Stephanie Carillo sent Mrs. Paterson a letter on July 28th asking her to review the respondent's written response to her complaint of housing discrimination. (See Attachment #57)

67. Kerry L. Chlarson sent a letter directly to Ms. Paterson informing her that they received her complaint and that the "Resolutions Conference has been scheduled for July 7th, 2014 at 9:30 AM at the Heber M. Wells Building." (See Attachment #58). Ms. Paterson's Housing Complaint was received by the UALD on June 10th, 2014. (See attachment #59).

68. In the spring of 2014, Valerie Iglesias, Ashley Gill and Songyoung Yoon signed a roommate contract. (See Attachment #60).

69. The Law Offices of Kirk A. Cullimore sent a letter with the UALD on July 11th 2014 notifying the office that they are representing Sk5 Wolverine Crossing, LLC, Andrea Austin and Jordan Hanks. They denied any and all claims of discrimination against the Complainant. That letter was received by the UALD on July 15th 2014. (See attachment #61).

70. Gabriella Salazar, a Support Specialist at the UALD, sent Ms. Paterson a letter on June 17th, 2015 that the processing of her complaint cannot be completed in one year from the date the complaint was received and notified her of the reasons for the delay in the completion of the processing and investigation of the complaint. (See Attachment #57)

71. Stephanie Carrillo, an investigator at the UALD, sent Ms. Paterson a letter on July 28th, 2014 informing her that the Respondents have filed a response to her complaint of housing discrimination. (See Attachment #62).

72. The Attorney for Ms. Paterson received a letter from the UALD requested documentation and information on September 15, 2015. The letter reads, " Dear Mr. Boam, At this point in the investigation, I need to request the following information/documentation from your clients in the above numbered cases: 1. Explanation/clarification of the proposed /actual subject matter of the tenant meeting at which a sign language interpreter was requested. 2. Explanation /clarification of the alleged shortcomings of the interpreter hired by Respondents for the tenant meeting in question. 3. Any and all documentation relating to the Complainant's specific request for closed captioning to be turned on during the community outdoor movie night along with

any replies the received from the Respondents." 4. Any and all documentation relating to the Complainant's specific request for a sign language interpreter at the community camping trip along with any replies the received from the Respondents. Please submit the requested information before September 25th 2015. Failure to submit the requested information or documentation by the required date may result in a determination being made only upon the information already provided. If you have any questions, please feel free to contact me at (801) 530-6924. Sincerely, Steven Rammell. Fair Housing Manager." (See Attachment #63).

73. Kerry L. Chlarson informed Ms. Paterson on October 26, 2015 that as a result of their finding of "No Cause" against the Respondents in that case, her case is dismissed. (See Attachment #57). Attached in that letter was the Final Investigative Report, Determination and Order which was issued that same day. (See Attachment #64).

74. Mr. Boam filed a Notice of Intent and Request to Appeal From Division's Determination and Order Order on November 13th 2015. See Attachment #65).

75. Kerry L. Chlarson sent a letter to Mr. Boam notifying him that they had received his request for reconsideration of the Director's determination. See Attachment #66).

76. Kerry L. Charlarson, Director of the UALD, sent Dale Boam his Order Denying Reconsideration in Kristen Paterson's case. Mr. Charlarson stated that there was "insufficient evidence to substantiate her claims" that "she was refused reasonable accommodations as required by Utah Fair Housing Law." (See Attachment #67).

77. Mr. Chlarson set Ms. Paterson's attorney on December 2nd 2015 the Order Denying Reconsideration. See Attachment #68).

78. Mr. Chlarson sent a letter to Ms. Paterson's attorney on December 3rd 2015

informing Mr. Boam that the "Division is denying the request for reconsideration of the Director's determination and order" that was datd on December 2nd 2015. (See Attachment #69).

## FIRST CAUSE OF ACTION

(Injunction and Damages for Violation of Title III of the ADA for excluding from participation in or denying the benefits of the services, programs, or activities of a public entity)

79.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 45 hereof, and incorporate the same herein by reference.

80.     Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock are all qualified persons with a disability as defined by the ADA, and was subjected to intentional discrimination at the hands of the Wolverine Crossing and their employees and agents by reason of their disabilities.

81.     The Defendants discriminated against the Plaintiff because of their disability by failing to or refusing to provide a qualified and certified American Sign Language Interpreter upon request for activities on the apartment complex or activities away from the apartments. They also refused to provide a qualified and certified American Sign Language Interpreter for employment/volunteer opportunities at the apartment complex.

82.     The ADA places a positive duty on Wolverine Crossing and organizations that lease and operate public places of accommodation and that provide services to the public, to assure that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation." §28 CFR 36.201

83.     The Defendants' failure to obtain a qualified and certified American Sign Language Interpreter was a "denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." §28 CFR 36.202(a).

84. The acts or omissions of the Defendants (or their agents) caused the Plaintiffs to suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity and interests. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much cherished independence. The injuries sustained by Plaintiffs relating to the Defendants' discrimination are ongoing until the discriminatory conditions are corrected by preliminary and permanent injunctions, enjoining the Defendants from further violations of the ADA.

85. Because the Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock were injured and suffered from severe emotional distress (much more than a typical person could be expected to endure) and they are entitled to compensation for such injuries.

86. Furthermore, the Plaintiffs suffered actual financial loss arising from the delay by spending money moving fees, gas, and other items in resolving this matter.

87. The Plaintiffs have been forced to engage the services of an attorney. Therefore, they entitled to an award of the attorney's fees and costs.

## SECOND CAUSE OF ACTION
(Violation of Title III, ADA–Disparate Treatment by Reason of Disability)

88. The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 54 hereof, and incorporates the same herein by reference.

89. The Defendants have engaged in discrimination by segregating, singling out or subjecting the Plaintiffs to disparate treatment by reason of their Deafness.

90. Due to the discriminatory policies, practices and procedures at Wolverine Crossing, the Defendants' excluded, denied services to, segregated, or otherwise treated differently the Plaintiffs by reason of their disabilities.

91. The Plaintiffs were and are subjected to discriminatory conditions and suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity interests.

92. This real and tangible injury has caused the Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock to incur costs in the form of fees and interest by spending personal funds to travel to meet with their attorney, funds which they would not have otherwise had to spend had the Defendants refused to provide a certified and certified ASL interpreters and other accommodations by reason of their Deafness.

93. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much-cherished independence.  The injuries sustained by the Plaintiffs relating to the discrimination at the Defendants hands are ongoing until the discriminatory conditions are corrected by policy and the source of the affront and indignity is rectified.

94. The Plaintiffs have been forced to engage the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs.

### THIRD CAUSE OF ACTION
(Violation of Title III, ADA–Discriminatory Policies, Practices and Procedures)

95. The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 hereof, and incorporate the same herein by reference.

96. Defendants engaged in discrimination by failing to modify their policies, practices, and procedures to ensure equal access to persons who are Deaf. As a result, by imposition or application of eligibility criteria that screen out or tend to screen out individuals with disabilities, specifically individuals who are Deaf, from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations including access to effective communication based on the needs of the individual and not a generalized assumption about a community.

97. Furthermore, the Defendants discriminated by refusing to provide a certified and qualified ASL interpreter. As a result, they engaged in illegal administrative procedures towards Plaintiffs.

98. By policies, practices and procedures, the Defendants failed or refused to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals without disabilities.

99. Because of Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock's disability, the Defendants denied them the ability to fully and equally participate at Wolverine Crossing events while other tenants were free to fully enjoy these events due to the Defendants' discriminatory behavior and practices.

100. The Plaintiffs were and are subjected to the discriminatory conditions and suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity and interests.

101. This real and tangible injury has caused the Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock to incur costs in the form of fees and interest by

spending personal funds to travel to meet with his attorney which he would not have otherwise had to spend had the Defendants refused to provide an ASL interpreters and other accommodations by reason of their Deafness.

102. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much cherished independence. The injuries sustained by the Plaintiffs relating to the discrimination at the Defendant's place of public accommodation are ongoing until the discriminatory conditions are corrected by granting the access required by law.

103. The Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock have been forced to engage the services of an attorney.  Therefore, they are entitled to an award of attorney's fees and costs.

## FOURTH CAUSE OF ACTION
(Injunction and Damages for Violation of Title III, ADA–Discriminatory Administrative Methods)

104. The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 70 hereof, and incorporate the same herein by reference.

105. The Defendants engaged in discrimination by maintaining discriminatory and illegal administrative methods.  The Defendants discriminate by excluding people with disabilities.  Defendants have not taken such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals.

106. Defendants have not properly trained employees as to the requirements for affording effective communication under the ADA.

107. Because of the disability of deafness, the Plaintiffs cannot fully and equally

28

access the services offered by the Defendant.  The Plaintiffs are regularly subjected to such discrimination and their opportunities are unfairly limited when businesses effectively ban them because of their disabilities.

108. The Plaintiffs are subjected to the discriminatory conditions present at Wolverine Crossing. The Plaintiffs have suffered irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity and interests.

109. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much cherished independence. The injuries sustained by the Plaintiffs relating to the discrimination at the Defendants' places of public accommodation are ongoing until the discriminatory conditions are corrected by either granting the access required by law or removing or shutting down the source of the affront and indignity.

110. The Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock have been forced to engage the services of an attorney.  Therefore, they are entitled to an award of the attorney's fees and costs.

### ***Prayer for Relief***

### **On the Plaintiff's First Cause of Action:**

(a) That this court exercise jurisdiction over this entire action;

(b) That this Court declare that the actions and failures to act of Defendants, including agencies employees, and agents, violated the Americans with Disabilities Act's mandate to refrain from excluding "from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity" by reason of their

deafness;

(c) For an order requiring the Defendant to adopt a comprehensive policy regarding communication access for members of the public who are Deaf and Hard of Hearing. If such a policy exists, an order requiring the administration to train its staff and agents including Officers of the Law in the application of such a policy;

(d) For an order requiring the Defendants to compensate the Plaintiffs for actual losses and the substantial emotional distress the Defendants' actions caused to Mr. Heineman;

(e) For an order awarding the costs of this action and reasonable attorney's fees to Plaintiff Mr. Heineman and;

(f) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

### On their Second Cause of Action:

(a) For a declaration that the Defendants are in violation of the ADA and for a permanent injunction enjoining each Defendant, Defendants' agents, employees and assigns from discrimination and disparate treatment on the basis of disability in violation of Title III of the Americans with Disabilities Act; and specifically requiring Defendants to adopt policies, practices and procedures that are fully compliant with the Americans with Disabilities Act;

(b) For an order requiring Defendants to change their discriminatory policies, practices and procedures in order to ensure that individuals who are deaf are not discriminated against by staff, employees and agents and to ensure that people who are Deaf are actively accommodated in ways that afford them full participation in Party events

and activities in a manner that is equal to that afforded persons without disabilities;

(c) For actual costs and compensatory damages for injuries caused by the Defendants' failure or refusal to comply with federal law;

(d) For the Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock;s attorney's fees, including litigation expenses, and costs of suit; and

(e) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

### On their Third Cause of Action:

(a) For a declaration that the Defendant is in violation of the ADA and for a permanent injunction enjoining each Defendant, Defendants' agents, employees and assigns from discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act; and specifically requiring Defendants to cease policies, practices and procedures that are not fully compliant with the Americans with Disabilities Act;

(b) For an order requiring Defendants to change their discriminatory administrative methods in order to assure that individuals who are Deaf are not discriminated against by staff, employees and agents by allowing persons who are Deaf to participate in Party events and activities in a manner that is equal to that afforded persons without disabilities;

(c) For actual costs and compensatory damages for injuries caused by the Defendants' failure or refusal to comply with federal law;

(d) For the Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock's attorney's fees, including litigation expenses, and costs of suit; and

(e) For such other and further relief (both under law and under the Court's broad

equitable jurisdiction) deemed appropriate by the Court.

## On their Fourth Cause of Action:

(a) For a declaration that the Defendant is in violation of the ADA and for a permanent injunction enjoining each Defendant, Defendants' agents, employees and assigns from discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act; and specifically requiring Defendants to cease all policies, practices and procedures that are not fully compliant with the Americans with Disabilities Act;

(b) For an order requiring Defendants to change their discriminatory administrative methods in order to ensure that individuals who are Deaf are not discriminated against by staff, employees and agents by allowing persons who are Deaf to participate in Party events and activities in a manner that is equal to that afforded persons without disabilities;

(c) For actual costs and compensatory damages for injuries caused by the Defendants' failure or refusal to comply with federal law;

(d) For the Plaintiff Plaintiffs Kristine Paterson, Edward Spreen and McCall Scadlock's attorney's fees, including litigation expenses, and costs of suit; and

(e) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

/s/: Jared Allebest
Jared Allebest, #13485
Attorney for Plaintiffs
8978 South Quarry Stone Way
Sandy, UT 84094
Cell: (949) 322-3991
Videophone: (801) 204-9055
Email: Jared@Allebest.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served this 17th day of December, 2016, by mailing on said date copies thereof by United States mail, certified first class postage prepaid, address to:

/s/: Jared Allebest
Jared Allebest, #13485
Attorney for Plaintiffs
8978 South Quarry Stone Way
Sandy, UT 84094
Cell: (949) 322-3991
Videophone: (801) 204-9055
Email: Jared@Allebest.com